## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| BUECHLER PHARMACY INC.,<br>SUPERIOR CARE PHARMACY INC.,<br>MS ARTESIA 742, INC., DANIEL REIF<br>INC., TRONE HEALTH SERVICES,<br>INC., TONI R. SUMPTER AND DANIEL<br>D. SUMPTER, and MARILYN GAYE<br>MOSEMAN & ROBERT F. MOSEMAN,<br>on behalf of themselves and others<br>similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MEDICINE SHOPPE<br>INTERNATIONAL, INC., MEDICAP<br>PHARMACIES INCORPORATED, and<br>CARDINAL HEALTH, INC. | )<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |

Case No.:  2:10-cv-207

**CLASS ACTION**   Judge Graham
        Magistrate Judge Abel
**JURY TRIAL DEMANDED**

### COMPLAINT

COME NOW Buechler Pharmacy Inc., Superior Care Pharmacy Inc., MS Artesia 742,

Inc., Daniel Reif Inc., Trone Health Services, Inc., Toni R. Sumpter & Daniel D. Sumpter, and

Marilyn Gaye Moseman & Robert F. Moseman (collectively, "Plaintiffs"), individually and on

behalf of all others similarly situated, by and through their undersigned attorneys, and for their

Complaint against Medicine Shoppe International, Inc. ("MSI"), Medicap Pharmacies

Incorporated ("Medicap"), and  Cardinal Health, Inc. ("Cardinal"), state as follows:

### NATURE OF THE CASE

This action arises from a franchise offering MSI made to all Medicine Shoppe and

Medicap franchisees in the United States on or about March 4, 2009 (the "2009 Offering").  MSI

made the offering because, by its own admission, its franchise system was no longer viable and

1191269

was in need of a transformation.  Over the years, the system devolved into an unworkable and oppressive regime under which MSI's franchisees (both Medicine Shoppe and Medicap) paid commercially impracticable royalties for an ever-shrinking bundle of services and ever-dwindling support.  The royalty structure and MSI's failure to offer needed support made it difficult or impossible for franchisees to operate their pharmacies successfully – as evidenced by the exodus of over 40% of system participants in the last decade.

MSI touted the 2009 Offering as the solution to its franchisees' problems.  The announced goal of the 2009 Offering was to move all franchisees to one new, standard agreement. The new agreement drastically decreased royalties from, in most instances, 5.5% of gross sales to $499 per month, reflecting a reduced bundle of services provided by MSI. In addition, the new agreement would allow new entrants to the franchise system to leave the system upon 90 days' notice without any restrictive covenants, and without the current contractual provisions for payment of years of future royalties calculated using 5.5% of gross sales.  As MSI stated, by moving all franchisees to the same platform, the franchisees could better compete and the system could grow.

Because a franchise system requires a high level of uniformity of programs and services, MSI required nearly unanimous agreement by the franchisees to one of three choices: they could (1) pay an early termination penalty equal to 55% of the future estimated royalties due for the remaining terms of their Legacy Franchise Agreements to terminate those agreements and transition to a new franchise system ("Option 1"); (2) pay a penalty equal to 100% of their estimated future royalties and exit the system entirely ("Option 2"); or (3) do nothing and remain a part of a broken system ("Option 3").  MSI expressly represented to its franchisees that the 2009 Offering was non-negotiable, that it would only honor its franchisees' choices if greater

than 95% of all franchisees and 100% of those franchisees with Most Favored Nation clauses in their legacy franchise agreements chose Option 1, that franchisees had to make their elections by April 10, 2009, and that MSI made the Offering to grow and promote the Medicine Shoppe and Medicap franchise systems.

All these representations proved false: MSI cut side-deals with some franchisees on better terms than it offered to the group as a whole, implemented the franchisees' elections even though less than 95% of all franchisees (approximately 54%) and less than 100% of franchisees with Most Favored Nation clauses chose Option 1, and extended the original election period until January 30, 2010, if not later.  This left MSI with what it expressly stated was detrimental to franchisees and the franchise system, i.e., a fragmented franchise system. Under this new system, services have been reduced to reflect the fact that some franchisees are paying a lower royalty but ignoring the fact that over 40% of the franchisees are paying royalties for services they no longer receive.  Even those franchisees with the lower royalty payments are saddled with a fragmented franchise system and debt for royalties on future sales that even MSI agrees are illusory given the lack of future viability of the former, and now continuing, fragmented franchise system.

Based on this and other conduct, Plaintiffs seek rescission or termination of their agreements with MSI, and damages for fraud and breach of contract.  They also seek the declaratory and or injunctive relief detailed below.

## THE PARTIES

### Medicine Shoppe Franchisees

1.      MS Artesia 742, Inc. ("MS Artesia") is a California corporation with its principal place of business in California.  MS Artesia is a citizen of California.  Prior to the 2009 Offering,

MS Artesia had a legacy franchise agreement with MSI ("Legacy Franchise Agreement").  MS Artesia elected Option 1 in response to the 2009 Offering, and paid hundreds of thousands of dollars in early termination penalties to facilitate its conversion to MSI's new franchise system.

2.      Buechler Pharmacy Inc. ("Buechler") is a South Dakota corporation with its principal place of business in South Dakota.  Buechler is a citizen of South Dakota.  Buechler entered into a license agreement with MSI in 1999.  Buechler's Legacy Franchise Agreement is due to expire in 2019.  In response to the 2009 Offering, Buechler elected Option 3.

3.      Daniel Reif Inc. ("Reif") is a Kansas corporation with its principal place of business in Kansas.  Reif is a citizen of Kansas.  Reif entered into a license agreement with MSI in 2004.  Reif's Legacy Franchise Agreement is due to expire in 2024.  In response to the 2009 Offering, Reif elected Option 3.

### Medicap Franchisees

4.      Superior Care Pharmacy Inc. ("Superior Care") is a Pennsylvania corporation with its principal place of business in Pennsylvania.  Superior Care is a citizen of Pennsylvania. Prior to the 2009 Offering, Superior Care had a Legacy Franchise Agreement with Medicap. Superior Care elected Option 1 in response to the 2009 Offering, and paid hundreds of thousands of dollars in early termination penalties to facilitate its conversion to MSI's new franchise system.

5.      Trone Health Services, Inc. ("Trone") is an Idaho corporation with its principal place of business in Idaho.  Trone is a citizen of Idaho.  Prior to the 2009 Offering, Trone had two Legacy Franchise Agreements with Medicap.  Trone selected Option 1 in response to the 2009 Offering for both of its franchises, and paid hundreds of thousands of dollars in early termination penalties to facilitate the conversion of both stores to MSI's new franchise system.

6.      Toni R. Sumpter & Daniel D. Sumpter ("the Sumpters") are citizens of Iowa.  The Sumpters entered into a license agreement with Medicap in 2000.  The Sumpter's Legacy Franchise Agreement is due to expire in 2020.  In response to the 2009 Offering, the Sumpters elected Option 3.

7.      Marilyn Gaye Moseman & Robert F. Moseman ("the Mosemans") are citizens of North Carolina.  The Mosemans entered into a license agreement with Medicap in 2000.  The Moseman's Legacy Franchise Agreement is due to expire in 2020.  In response to the 2020 Offering, the Mosemans elected Option 3.

## Defendants

8.      Cardinal is the second largest distributor of pharmaceuticals and related products and services in the United States.  Beyond its drug distribution business, Cardinal is involved in the sale and manufacture of pharmaceutical product packaging, medical products, the provision of pharmacy management services, staffing and consulting, and supply chain services.  With nearly $100 billion in annual revenues, Cardinal is the 60th largest company in the world according to Fortune Magazine.

9.      Cardinal is a Delaware corporation with its principal place of business in Dublin, Ohio.  Cardinal is a citizen of Delaware and Ohio.

10.     MSI is largest franchisor of independent community pharmacies in the United States.  It has offered Medicine Shoppe branded, apothecary-style franchises throughout the United States for almost four decades.  At its height, MSI had more than 1100 independent franchisees.  Today, MSI has fewer than 700.

11.     Cardinal acquired MSI in 1995. Since that time, Cardinal has "absolutely and unconditionally" guaranteed MSI's conduct and contractual obligations with respect to Medicine

Shoppe franchisees.  Its standard guarantee reads as follows:

> [Cardinal] absolutely and unconditionally guarantees to assume the duties and obligations of [MSI] under its franchise registration in each state where the franchise is registered, and under its Franchise Agreement identified in its [] Franchise Disclosure Document, as it may be amended, and as that Franchise Agreement may be entered into with franchisees and amended, modified or extended from time to time.  This guarantee continues until all such obligations of the Franchisor under its franchise registrations and the Franchise Agreement are satisfied or until the liability of Franchisor to its franchisees under the Franchise Agreement has been completely discharged, whichever first occurs.   The Guarantor is not discharged from liability if a claim by a franchisee against the Franchisor remains outstanding. . . .

A true and accurate copy of Cardinal's guarantee is attached hereto as **Exhibit A.**

11. 12.     MSI is a Delaware corporation with its principal place of business in Dublin, Ohio.  MSI is a citizen of Delaware and Ohio.

13.     Medicap began franchising in Iowa in 1973.  Over the years, Medicap began offering franchises outside of Iowa, and by 1993, Medicap had more than 100 franchises around the country.  For a number of years, Medicap competed with MSI.

14.     MSI acquired Medicap in 2003.  Since this acquisition, MSI has integrated Medicap franchises into the Medicine Shoppe system.  Today, independent Medicine Shoppe and Medicap franchisees operate within the same basic system – they just use different names.

15.     Cardinal has also "absolutely and unconditionally" guaranteed Medicap's conduct and contractual obligations with respect to Medicap franchisees since the acquisition.

16.     Medicap is an Iowa corporation with its principal place of business in Des Moines, Iowa.  Medicap is a citizen of Iowa.

## VENUE AND JURISDICTION

17.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1332(d)(2) because this is a class action in which members of a class of plaintiffs (including the named Plaintiffs) are citizens

of states different from the Defendants and the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs.

18.     Cardinal, MSI and Medicap do substantial business in Ohio.  Cardinal and MSI are headquartered in Dublin, Ohio.  Medicap, like MSI, has franchisees within Ohio.  This Court thus has personal jurisdiction over the Defendants.

19.     Venue lies in this district pursuant to 28 U.S.C. § 1391 because Cardinal resides in Dublin, Ohio, which is in this District.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### The Medicine Shoppe Legacy System

20.     For many years, the Medicine Shoppe brand (the "Brand") was vibrant and attractive, and the legacy franchise system (the "Legacy System") offered real value and the strong potential for success.

21.     On the strength of the Brand and the Legacy System, and the assumption that MSI would continue to support both pursuant to its contractual obligations, MSI's franchisees typically entered into twenty-year franchise agreements under which they agreed to pay monthly royalties equal to 5.5% of their pharmacies' gross revenues.  The System worked for many years, and MSI and many of its franchisees prospered.

### A TYPICAL MSI LEGACY FRANCHISE AGREEMENT

22.     Over the years, MSI has offered franchises through several different license agreements.  For purposes of this lawsuit, the terms of these agreements are functionally identical.  A true and accurate copy of Buechler's Legacy Franchise Agreement is attached as **Exhibit B**.

23.     In a typical Legacy Franchise Agreement, MSI granted a franchisee the exclusive

right, through a license, to operate a Medicine Shoppe pharmacy in a defined geographic territory for twenty years.  (**See** **Exh. B §§ 1.B. at 1; I.C. & 1.E. at 2**.)  The territory designated in a typical agreement was exclusive, and MSI agreed not to license another franchise in a franchisee's geographic area during the term of the franchisee's agreement.  (**See** **Exh. B § 1.C. at 1**.)

24.     To obtain a franchise under the Legacy System, a franchisee had to pay an origination fee, which ranged, depending on the year and type of franchise desired, from $10,000.00 to $18,000.00.  (**See** **Exh. B § 6.B. at 7**.)

25.     In addition to origination fees, franchisees had to pay monthly royalties in the form of continuing license fees, which were set at 5.5% of a franchisee's gross revenue.  (**See** **Exh. B § 6.C. at 7**.)

26.     In return for these payments, MSI agreed to provide access to its "propriety know-how . . . relating to the operation of professional pharmacies."  (**See** **Exh. B § 1.A. at 1**.)  MSI also agreed to provide access to its "formats, designs, signage, layouts, methods, specifications, standards, operating procedures, guidance and marks which comprise the system." (**Exh. B § 1.A. at 1**.)

27.     Its legacy agreements and its course of conduct also obligated MSI to provide various support and services to its franchisees and franchise system including, but not limited to: store accounting, national and local advertising, local store public relations and development, various merchandising systems and services, national meetings, vendor duplication, subsidies for broadband internet access, rebates for specialty drugs, and other guidance and system standard maintenance and direction. (**See,** **e.g.,** **Exh. B §§ 1.B, 4.B. 7.A., & 8.A**.)

28.     The typical Legacy Franchise Agreement allowed a franchisee to transfer its

franchise to a qualified purchaser provided certain conditions were met.  (**Underline Exh. § 10.B. at 15**.)

29.     The ability of both MSI franchisees to transfer their franchises was an essential component of the Legacy Franchise System.   In the course of their Legacy Franchise Agreements, franchisees spend many years building their business and cultivating their clientele. They were willing to do this because their Legacy Franchise Agreements provided for the eventual transfer of the franchises to reasonable purchasers.  This model, in effect, allowed a franchisee to build his or her business over the years, sell it to a newcomer, and then use the sale proceeds to fund a portion of his or her retirement.

### LICENSE AGREEMENT RENEWALS IN THE LAST FIVE YEARS

30.     In 2004, MSI began offering different terms to legacy franchisees who renewed their agreements and extended their terms pursuant to Early Renewal Amendments.   In these agreements, MSI included a "Most Favored Nation" clause ("MFN" or "MFN clauses"), which served as a key, material incentive to some of MSI's most loyal, dedicated, and long-standing franchisees to extend the terms of their Franchise Agreements.

31.     The MFN clauses provided that, if at any time during the term of the agreement, MSI offered "a new form of license agreement to all new franchisees in the state in which the [franchise] is located, the Franchisee shall have the option of converting the [Agreement] to the new form of agreement for the remaining term of the [Agreement]."

32.     These MFN clauses further provided that MSI would not require franchisees "to pay any new initial fee to [MSI] in connection with the execution of that agreement."

33.     Importantly, MSI has decreased the royalties in the license agreements it has renewed in the last five years.  Instead of royalties of 5.5%, the new agreements set royalties at

2.2%, which reflects the decline in the value of access to the Medicine Shoppe system and marks.

## The Medicap Legacy System

34.     After it acquired Medicap in 2003, MSI essentially integrated Medicap franchisees into its Medicine Shoppe System (hereinafter, where appropriate, all references to the System or to the Medicine Shoppe System shall refer both to the Medicine Shoppe franchise system and the Medicap franchise system).  Medicap franchisees thus lost much of the support they had traditionally received from Medicap when it was independent, when they transitioned into the MSI/Cardinal family of companies.

### A TYPICAL MEDICAP LEGACY FRANCHISE AGREEMENT

35.     Medicap has offered franchises through a variety of license agreements, all of which have functionally identical terms for purposes of this lawsuit.  A true and accurate copy of the Moseman's franchise agreement is attached as **Exhibit C**.

36.     In a typical Medicap Franchise Agreement, Medicap granted a franchisee the exclusive right to operate a retail Medicap Pharmacy store in a designated geographic territory. (**Exh. C § I**.)  A franchisee, in turn, agreed to pay Medicap an initial franchise fee of $15,000 and an ongoing license fee equal to 4% of the franchisee's gross receipts.  (**Exh. C § IV**.)

37.     In addition to the initial franchisee fee and the royalties, Medicap required its legacy franchisees to pay 1% of their gross receipts toward a national marketing fund and an additional 1% of their monthly gross receipts (or $200, whichever was more) toward local advertising. (**Exh. C § IV**.)

38.     Medicap agreed to make available to its franchisees a management training course to cover all phases of the Medicap Pharmacy store operation.  Furthermore, Medicap promised to

make available continuing training and guidance through periodic visits to the franchisee's pharmacy and through periodic seminars, workshops, and equipment exhibits. (**Exh. C § II**.)

39.     The Legacy Franchise Agreements allowed Medicap franchisees to transfer their franchises, with Medicap's permission.    Medicap agreed not to unreasonably withhold permission as long as certain conditions and requirements were met. (**Exh. C § VIII**.)

40.     The ability of Medicap franchisees to transfer their franchises was an essential component of the Legacy Franchise System.    In the course of their Legacy Franchise Agreements, franchisees spend many years building their business and cultivating their clientele. They were willing to do this because their Legacy Franchise Agreements provided for the eventual transfer of the franchises to reasonable purchasers.  This model, in effect, allowed a franchisee to build his or her business over the years, sell it to a newcomer, and then use the sale proceeds to fund a portion of his or her retirement.

## The Decline Of The Medicine Shoppe System

41.     In 1995, Cardinal acquired MSI.  Both Cardinal and MSI touted the synergies produced by the acquisition and presented a rosy outlook for the success of the Brand and the Legacy System.    Over time, however, MSI, at Cardinal's behest, has failed to fulfill its contractual obligation to act in a manner consistent with the maintenance and improvement of the Brand and System.  Since Cardinal acquired MSI, the number of MSI franchises has dropped from a high of well over 1100, to fewer than 700.  Each and every pharmacy that has failed or has otherwise discontinued identification with Medicine Shoppe and Medicap has devalued the System and the Brand, and left each of the remaining Medicine Shoppe and Medicap franchisees in a worse position.

42.     MSI has failed meaningfully to change any significant aspect of its system in the

last twenty or thirty years, despite the drastic changes that the pharmaceutical industry has undergone during the period.  MSI has stopped offering various services it obliged itself to provide through its Legacy Franchise Agreements and its course of conduct, including, but not limited to: advertising services, accounting services, meaningful guidance, and updates to its System Standards Manual.  MSI also stopped providing its Managed Pharmacy Benefits Network ("MPBN"), one of the few successful programs it has offered in recent years.

43.     Without question, the most prominent impediments to the success of the Systems and the franchisees operating under their terms are the excessive royalties that MSI and Medicap charge under their Legacy Franchise Agreements.  These excessive royalties, combined with low reimbursement rates on prescriptions from third-party payors, has left Plaintiffs and other Medicine Shoppe and Medicap franchisees with dwindling or non-existent margins.  The burden of the excessive royalties has driven hundreds of franchisees out of the system and pushed many others to the brink of financial ruin.

44.     Those franchisees who have enjoyed some measure of success under the Legacy System have also been substantially impeded in their businesses by the excessive and unfair royalties and MSI's failure to operate the System for the benefit of its franchisees.  These franchisees could, if they were not subject to an anachronistic cost structure, be expanding their businesses and further promoting the strength of the System and the Brand.

45.     MSI, of course, has been well aware of the changes in the industry and the burden of the royalties it continues to impose.  Indeed, no franchisor could ignore the fact that it lost 40% of its franchisees in less than a decade.  This recognition has also played out in those agreements it has renewed in the last five years or so.  These agreements provide for significantly reduced royalties 2.2% – approximately 60% less than the legacy royalties.

46.     Cardinal has also recognized the challenges posed under the Legacy System to various financial and industry media.  For example, Cardinal's chief executive officer, George Barrett, noted in September 2009 that "[c]ustomers of [Cardinal's] pharmaceutical distribution business are facing a lot of economic pressures" and Cardinal needed "to find new ways to help [those customers] find new ways to compete in their markets."   A true and accurate copy of Mr. Barrett's interview with Peter Benesh, which was published on September 11, 2009, is attached as **Exhibit D**.   As the offering documents make clear, Cardinal's solution to the problem was the implementation of "market competitive offerings and franchise fees."  A true and accurate copy of MSI's 2009 Offering Packet and Summary is attached as **Exhibit E**.

47.     In sum, MSI and Medicap, at the direction of Cardinal, have ceased to be active and involved franchisors.  Without the support of active franchisors, the brands and systems have foundered.  MSI's and Medicap's passivity, the length of the franchise agreements, and the changing nature of the business have put Medicine Shoppe and Medicap franchisees in an untenable position in a dynamic and competitive market.

## The New 2009 Franchise Offering

48.     In March 2009, MSI decided to "re-evaluate" its franchise agreements in light of "[r]ecent changes in [the] industry, and increasingly complex regulatory and government environment, changing consumer needs and challenging economic conditions."  (**Ex. E**.)

49.     To that end, MSI sent the 2009 Offering documents to all its existing franchisees, both Medicine Shoppe and Medicap. MSI made clear that its solution, embodied in the 2009 Offering, was a wholesale transition to a new franchise agreement under which franchisees would pay a royalty of only $499.00 per month.  MSI pitched the 2009 Offering as the practical way to grow the business and the system, but made clear that it would only work if all or nearly

all franchisees agreed to go along with it.

50.     The 2009 Offering gave franchisees the choice of one of three options.  They could (1) buy out the remaining terms of their franchise agreements for an early termination penalty equal to 55% of the estimated royalties their franchises would generate over the remaining terms of the agreements, and transition to a new system; (2) buy out of the remaining terms of their agreements for an early termination penalty equal to 100% of the franchises' estimated future royalties; or (3) remain subject to their Legacy Franchise Agreements, but with fewer services and system support.

51.     MSI made the 2009 Offering in the form of a Franchise Disclosure Document ("FDD"), which was hundreds of pages long, and a packet summarizing the FDD (the "Packet") (together, the "Offering Documents").  MSI told its franchisees that they had to make their decision no later than April 10, 2009, and that the 2009 Offering was non-negotiable.  Notably, the FDD contained Cardinal's unconditional and absolute guarantee of MSI's obligations under the FDD and any new agreement entered into pursuant to the 2009 Offering.

52.     In the Offering Documents, MSI expressly reserved its right to revoke the 2009 Offering in the absence of "overwhelming participation of [its] eligible franchisees."  (**Ex. E.**) MSI affirmatively represented to its franchisees that if they did not overwhelmingly choose Option 1, MSI would withdraw the 2009 Offering, and all franchisees would continue under their existing agreements as if the 2009 Offering had never been made.   According to MSI, it needed "consistency across the franchise system to be able to support [the] new agreement." (**Id.**)

53.     MSI also told its franchisees that it would not accept their elections and implement the New System unless all franchisees with MFN clauses in their Legacy Franchise Agreements elected Option 1.  By the 2009 Offering's express terms, MSI said it would not go

through with the transition to the New System without "universal" acceptance by this group. (**Ex. E**.)

54.      MSI took its 2009 Offering on the road in order to pitch it face-to-face to as many franchisees as possible.      During its road show information meetings, MSI defined "overwhelming participation" for Plaintiffs and other Medicine Shoppe and Medicap franchisees.   It told them that overwhelming participation meant at least 95%.   MSI thus expressly represented to its franchisees that it would not elect to transition to the New System unless greater than 95% of all eligible franchisees chose Option 1.  MSI also made it clear to the franchisees who attended these meetings that the 2009 Offering was non-negotiable.

### THE NEW AGREEMENT

55.      In the agreement offered in the 2009 Offering (the "New Agreement"), MSI grants franchisees (both Medicine Shoppe and Medicap) the right to use its trademarks, a "core" package of services, and other procedures and forms for the operation of an independent franchise.  A true and accurate copy of the New Agreement is attached as **Exhibit F**.

56.      The New Franchisee, in exchange for the use of MSI or Medicap trademarks and MSI's core services, agreed to pay a monthly continuing license fee of $499.00.  (**Exhibit F at 5**.)  The New Agreement does not require New Franchisees to pay any origination fees.

57.      The New Agreement obligated franchisees to "purchase certain items, including substantially all pharmaceutical inventory, from [MSI's] designated supplier." (**Ex. F at 2-3**.) The designated supplier under the agreement could be MSI, an affiliate of MSI, or an independent contractor.  (**Id. at 3**.)  In reality, most, if not all the suppliers were Cardinal affiliates or Cardinal itself.

58.      For new entrants to the system who were not Legacy Franchisees, the term of the

New Agreement was, purportedly, five (5) years. (**Ex. F at 16**.)  In reality, however, the term was 90 days because MSI and Medicap, as well as their new franchisees, have an absolute right to terminate the New Agreement upon 90 days written notice.  (**Ex. F at 7-8**.)  This provided new entrants with yet another advantage over the Legacy franchisees – they could terminate without any penalty.  The Legacy franchisees, on the other hand, would be forced to pay the full value of their forgivable notes if they terminated their "new agreements" within five years.

59.     The New Agreement sets the high end for the value of access to the Medicine Shoppe System and Brand and the Medicap System and Brand: $499.00 per month.

60.     Although the Legacy Franchise Agreements contain post-term covenants not to compete, which are necessary to protect and preserve the goodwill of the Marks and the franchise system, the New Agreement does not contain a non-compete provision.  MSI's failure to include a non-compete provision in the new agreement is additional evidence that the value of the Medicine Shoppe and Medicap marks had diminished to a point where MSI deemed them no longer worth protecting, and MSI's lack of commitment to the franchise system.

61.     The New Agreement, coupled with Cardinal's response to the 2009 Offering, is objective evidence of Cardinal's intention to get out of the franchise business for good.  By cutting the services MSI provides and including a 90-day kick-out provision in the New Agreement, Cardinal would have had – had all eligible franchisees chosen Option 1 –  exactly what it wanted: a captive distribution network it could sell drugs to for as long as it found convenient, and no longer.

**OPTION 1 A**

62.     A franchisee who chose Option 1 transitioned to the New Agreement and the new system created for it (the "New System") upon payment of an early termination fee equal to 55%

of the royalties MSI/Medicap predicted the franchisee would pay over the remaining term of its Legacy Franchise Agreement.  Thus, a franchisee who had 15 years remaining on its Legacy Franchise Agreement would have paid 55% of the total value of all royalties MSI estimated it would have collected over that 15-year period.

63.    An Option 1 franchisee also had to sign a forgivable note equal to the remaining 45% of the franchise's future royalties.  If the Option 1 franchisee met certain conditions for five years after transitioning to the New Agreement – if it remained current on all applicable payments and did not commit any acts that would make the franchise terminable under the New Agreement, among other things – Cardinal would forgive the Forgivable Note, and the franchisee would be free and clear from that obligation in perpetuity.

64.    An Option 1 franchisee also had to sign a Termination Agreement And Release ("Release" or "Releases").  The Releases were the mechanism under which Option 1 franchisees terminated their Legacy Franchise Agreements and paid their early termination penalties.  As the name of the agreement implies, MSI and Medicap forced Option 1 franchisees to (purportedly) release MSI, Medicap, and Cardinal from any and all liability arising out of the Legacy Franchise Agreements and the franchisee/franchisor relationship in general.

65.    Only after an Option 1 franchisee signed its Release did it sign a copy of the New Agreement.  The term of the New Agreement for an Option 1 franchisee was the remaining term of its Legacy Franchise Agreement.  For example, a franchisee with three years remaining on its Legacy Franchise Agreement would have a New Agreement with a three-year term.

66.    MSI also required those franchisees who elected Option 1 to buy most of their drugs from Cardinal for the remaining terms of their new franchise agreements.

## OPTION 1 B

67.     The Offering also contained a variant of Option 1 – sometimes referred to as Option 1 B – under which the franchisee choosing to transition to the New System could receive financing from Cardinal on the early termination penalty at an annual rate of 9.5%.   Receiving financing from Cardinal did not change any other aspect of the deal.

68.     The rate at which Cardinal offered financing to Option 1 franchisees is telling of MSI's and Cardinal's faith in the New System.  An annual rate of 9.5% is significantly higher than the rates at which lenders were making commercial loans under similar circumstances in the second, third, and fourth quarters of fiscal year 2009.

69.     Like the $499.00 license fees charged under the New Agreements, the interest rate Cardinal offered is objective evidence of just how risky MSI and Cardinal viewed the transition, and the extent of their faith in Medicine Shoppe and Medicap franchisees' ability to generate sufficient revenue to repay the early termination penalty loan.  Despite its demonstrable lack of faith in its New System, MSI structured the early termination penalty on royalties MSI projected it would have recovered for years under a system that has already been effectively halved in less than 10 years.

## OPTION 2

70.     Option 2 "allowed" Legacy franchisees to terminate their agreements for an early termination penalty equal to 100% of the franchisee's expected future royalties.

71.     To qualify for Option 2, the Offering dictated that a franchisee had to pay its early termination penalty and de-identify as a Medicine Shoppe or Medicap pharmacy by June 15, 2009.

72.     Those franchisees who elected Option 2 did not have the ability to obtain

financing from Cardinal.

## OPTION 3

73.     Option 3, which was the default option (i.e., MSI automatically assumed that a franchisee who did not elect Options 1 or 2 elected Option 3), purportedly left franchisees subject to their Legacy Franchise Agreements.

74.     Despite the fact that the 2009 Offering, if MSI chose to accept the franchisees' respective elections, created a dual system – one, a franchise system, and the other, a captive distributorship – MSI did not offer any concessions to those franchisees who chose Option 3. Indeed, MSI made it exceedingly clear that it would cut services it had provided in the past under the Legacy System, and by its conduct, implicitly agreed to provide, without any change in the amount or calculation of the royalties due.

75.     In effect, Option 3 franchisees agreed to a new agreement under which they received fewer services for the same exorbitant royalties, and no brand or system support going forward.

## NEW ENTRANTS TO THE NEW 2009 AGREEMENT

76.      Non-Legacy franchisees who chose to participate in the 2009 Offering could obtain a franchise with no initiation fee.  MSI charges new entrants into the New Franchise System the same license fee of  $499.00 per month, but does not charge any origination fees.

## THE RESPONSE TO THE OFFERING

77.     In mid-2009, MSI extended the enrollment period (i.e., the period in which Option 3 franchisees could elect Option 1) until June 30, 2009.  Subsequently, in a letter from Terry Burnside, MSI's general manager, dated November 3, 2009, MSI extended the enrollment period to January 15, 2010.  A true and accurate copy of Mr. Burnside's November 3, 2009 letter

is attached as **Exhibit G**.

78.     On June 25, 2009, MSI sent notice that it and Cardinal had ratified the New Franchise System and the elections franchisees made in response to the 2009 Offering ("Ratification Letter").  A true and accurate copy of the Ratification Letter is attached as **Exhibit H**.

79.     In the Ratification Letter, MSI and Cardinal notified those franchisees who chose Option 1 that their conversion to the New System would be effective on July 1, 2009.  To close this letter, Mr. Burnside thanked those who chose Option 1 for their "commitment to a franchise system designed to meet the needs and opportunities of the changing retail pharmacy industry." Left unsaid, of course, but plainly implied, was that the Legacy Systems no longer meets the needs of Medicine Shoppe and Medicap franchisees and is unsustainable, even in the short term.

80.     In a Memorandum from Mr. Burnside dated August 10, 2009, MSI informed franchisees of the results of the 2009 Offering.  A true and accurate copy of this memorandum is attached as **Exhibit I**.  As of July 27, 2009, Mr. Burnside reported that 184 franchisees chose Option 1 A, 205 franchisees chose Option 1 B, 29 franchisees chose Option 2, and 303 franchisees chose Option 3.  Of the 721 franchisees subject to the Offering, 54% chose a variant of Option 1, 4% chose Option 2, and 42% chose Option 3.

81.     Though only 54% of MSI franchisees chose Option 1 – far less than overwhelming participation by any reasonable definition, and certainly far less than the 95% promised – MSI opted to accept its franchisees' elections and continue to roll out the New Agreements and the New System.

82.     On information and belief, fewer than all those franchisees with MFN clauses in their Legacy Franchise Agreements elected Option 1.  MSI, of course, ratified the 2009 Offering

despite the fact that it expressly told its franchisees it would not do so unless Option 1 was uniformly accepted by these franchisees.

### The Effect Of The 2009 Franchise Offering

83.     MSI's response to the 2009 Offering makes one thing crystal clear:  MSI is no longer interested in owning a franchise system.  MSI has shifted its focus to licensing its mark and selling Cardinal products.  In light of MSI's fraud, and its decision to go forward without the universality it purported to need, Defendants' action can only be viewed as an effort to transform the vestiges of the Medicine Shoppe and Medicap franchise systems into captive markets for Cardinal's pharmaceutical distribution business, and, in the process, squeeze every last penny out of the System before it ultimately fails.

84.     There can be no question that the 2009 Offering was designed to create additional business for Cardinal – MSI itself has expressly admitted that it was "looking at a shift away from the way [it] approach[es] franchise fees to one that is really more about driving business with these [franchise] accounts."  A true and accurate copy of remarks Cardinal's CEO, George Barrett, made at the Morgan Stanley Global Healthcare Conference on September 15, 2009 is attached hereto as **Exhibit J**.  Notably, the 2009 Offering was similar in structure to the model that has been adopted by several of MSI's major competitors, and represents a recognition that the Legacy Systems are broken and the Legacy Franchise Agreements are outdated.

85.     The 2009 Offering worked to MSI's sole benefit, despite MSI's pronouncement that it "is committed to the success of [its] franchises and in creating a mutually beneficial business proposition both for franchisee and franchisor."  (**Ex. E**.)

86.     The 2009 Offering and the New System created dual "franchise" systems and put all Medicine Shoppe and Medicap franchisees in positions worse than they were in previously.

87.     Option 1 franchisees paid a grossly unfair early termination penalty, based on overpriced licensed fees calculated on the basis of a moribund franchise system, to join an untested system.  MSI and Cardinal, on the other hand, reaped a substantial windfall profit from these early termination penalties for taking no risks whatsoever.

88.     Option 1 B franchisees cut an even worse deal.  They were forced to pay the early termination fee, plus interest at a rate of 9.5%.  Cardinal thus collected an annual return of almost 10% on huge sums to which it was not entitled and should not have received in the first place.

89.     Option 2 franchisees paid an even more unfair price than those who chose Option 1.  MSI, Medicap, and Cardinal, of course, reaped a substantial benefit from forcing their Option 2 franchisees to pay unfair early termination penalties.

90.     Option 3 franchisees were left on the wrong side of a two-sided system.  They were left paying a fee that was unfair for fewer services in support of brands and systems which are little more than shadows of their former selves.  Indeed, they now pay more than the $499.00 monthly royalty new entrants pay, despite the fact that MSI and Medicap cut off services they used to provide, including, among others: store accounting, national and local advertising, local store public relations and development, access to various merchandising systems and services, national meetings, vendor duplication, subsidies for broadband internet access, rebates for specialty drugs, and other guidance and system standard maintenance and direction.

91.     MSI and Medicap now allow new entrants into the system for free.  The decision was injurious as well because it rendered Option 3 franchises unmarketable.

## Class Allegations

92.     Plaintiffs bring this action on their own behalf and as the representatives of a class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), consisting of all

Medicine Shoppe and Medicap franchisees who elected Option 1 or Option 3 in response to MSI's New 2009 Franchise Offering, and their successors and/or assigns (the "Class"). Plaintiffs hereby expressly reserve the right to seek certification of certain issues pursuant to Rule 23(c)(4) and various subclasses pursuant to Rule 23(c)(5), should they so desire.

93.   Upon information and belief, the Class exceeds 675 individuals or entities, and is therefore so numerous that joinder of all members would be impractical.

94.   The claims for relief asserted herein on behalf of Plaintiffs and the putative class members present questions of law and fact common to the Class, including:

a.   whether the royalties MSI and Medicap charge under their Legacy Franchise Agreements are unreasonable in light of market conditions and Brand and System support, or lack thereof;

b.   whether MSI, Medicap, or Cardinal made fraudulent misrepresentations in the 2009 Offering, regarding, among other things, the period during which a franchisee could choose one of the options presented, the participation necessary for MSI, Medicap, and Cardinal to accept the options chosen by franchisees, the negotiability of the New Agreements, and the future financial performance of franchises under the New Agreement;

c.   whether MSI and Medicap breached their obligations under the Legacy Franchise Agreements by making the 2009 Offering;

d.   whether the early termination penalties charged under the 2009 Offering were fair and reasonable; and

d.   whether MSI and Medicap breached their obligations under the Legacy Franchise Agreements and the New Agreements by allowing non-Legacy

entrants entry into the New System without origination fees and without payments similar to those payments MSI and Medicap charge their Legacy franchisees.

95.    Plaintiffs' claims are typical of the claims of the putative Class in that:

a.    Plaintiffs have been franchisees under the Legacy System for a number of years;

b.    Plaintiffs have witnessed the decline in the System and Brand, and have seen their profits and profit margins decline as a result of Defendants' lack of Brand and System support;

c.    Plaintiffs have paid the royalties under their Legacy Franchise Agreements;

d.    Plaintiffs received the 2009 Offering from MSI;

e.    Plaintiffs attended MSI's and Medicap's "road shows" regarding the 2009 Offering;

f.    MSI, Medicap, and Cardinal forced Plaintiffs to make their decisions regarding the 2009 Offering on fraudulent and/or incomplete information in an extremely short period of time;

g.    Plaintiffs acted or failed to act based on Defendants' fraudulent misrepresentations when choosing their respective options in response to the 2009 Offering; and

h.    Plaintiffs chose both Option 1 and Option 3.

96.    Plaintiffs, as representatives of the Class, will fairly and adequately protect the interests of the Class because, among other things:

a.   Plaintiffs have knowledge regarding the facts and circumstances that give rise to their claims and claims of the Class and its members;

b.   Plaintiffs are strongly interested and highly motivated to assert and protect their own rights and the rights of Class members in a vigorous fashion;

c.   Plaintiffs have suffered greatly at the hands of MSI, Medicap and Cardinal;

d.   Plaintiffs have retained counsel with substantial expertise and experience in class actions and complex litigation that have the necessary and adequate resources to prosecute this case to completion.  The attorneys will also vigorously assert and protect the interests of Class members.

97.   The questions of law and/or fact common to Plaintiffs and Class members predominate over any questions affecting only individual members of the Class, and a class action as asserted herein is superior to other available methods for the fair and efficient adjudication of this controversy, in that, among other elements:

a.   the interests of Plaintiffs and the interests of individual Class members in controlling the prosecution of separate actions are outweighed by the advantages of adjudication of the common issues of fact and law by means of a class action; individual actions would not be practical;

b.   upon information and belief, there are no pending certified class actions concerning the controversy at issue or the claims asserted in this case applicable to Plaintiffs or the Class members set forth herein;

c.   concentrating litigation of these claims in this forum is desirable because it will prevent and avoid a duplication of effort and the possibility of

inconsistent results, and this forum represents an appropriate forum to settle the controversy based on the location of Plaintiffs, the putative Class members, and the availability of witnesses and evidence; and

d.      any difficulties that may be encountered in the management of the class action are greatly outweighed by the difficulties of handling multiple actions by individual class members; this class action is a superior method because it furthers judicial economy and efficiency and is in the best interest of Plaintiffs and Class members.

98.     Class litigation is an appropriate method for the full and efficient adjudication of the claims involved.  Plaintiffs seek equitable relief, declaratory relief, and money damages.

99.     Plaintiffs request trial by jury on all Counts in this Complaint for which a jury trial is available.

## COUNT I: FRAUD

100.    For this Paragraph 100, Plaintiffs plead, allege, and incorporate by reference Paragraphs 1 through 99 of the Complaint as if fully set forth herein.

101.    In the FDD and Packet, MSI, Medicap, and Cardinal represented, among other things, that they would only go forward with the New System if (1) an overwhelming number franchisees chose Option 1, and (2) those franchisees with MFN clauses "universally" chose Option 1.  They also expressly stated that (3) franchisees had to make their decisions by April 10, 2009, (4) the 2009 Offering was non-negotiable, and (5) the 2009 Offering was made to grow and promote the Medicine Shoppe and Medicap franchise systems.

102.    All of these misrepresentations were fraudulent.  Even though fewer than 55% of eligible franchisees elected Option 1, far less than the 95% figure MSI and Medicap quoted, and

fewer than all those franchisees with MFN clauses in their agreements chose Option 1, MSI, Medicap, and Cardinal elected to move forward with the transition to the New System.  MSI and Medicap cut side deals with several franchisees, giving them better deals than they gave to the franchisees as a group, and MSI and Medicap reneged on their firm deadline of April 10, 2009 as the cut-off for the election, or, open enrollment period, and allowed Option 3 franchisees to elect Option 1 until January 15, 2010.  MSI's, Medicap's, and Cardinal's decision to ratify the New System and the nature of the New System itself absolutely demonstrate that MSI, Medicap, and Cardinal did not intend the 2009 Offering to grow and promote the Medicine Shoppe and Medicap franchise systems.

103.   MSI, Medicap, and Cardinal knew that these representations were false when Option 1 franchisees made their elections on or before April 10, 2009, when they sent the Ratification Letter on June 25, 2009, when they procured the Releases from Option 1 franchisees, when they signed each and every new agreement with each and every Option 1 franchisee, when they reopened the enrollment period in November 2009, and when each and every Option 3 franchisee decided to remain subject to their existing Legacy Franchise Agreements.

104.   MSI, Medicap, and Cardinal included these misrepresentations in the very documents they told their franchisees to rely on when evaluating the 2009 Offering, and failed to correct them at key points in the franchisees' collective decision making process.  Thus, without question, MSI, Medicap, and Cardinal intended their franchisees to rely on these misrepresentations.

105.   Plaintiffs and other Class members did not know and had no reason to know that MSI's, Medicap's, and Cardinal's representations were false.  Among many other things, MSI,

Medicap, and Cardinal had independent obligations to correct any representation or other information included in the FDD or related documents at least quarterly, and they never did.

106.    Plaintiffs and other Class Members relied on the truth of Defendants' misrepresentations when deciding to choose an option in response to the 2009 Offering, when signing Releases, when they signed their New Agreements, and when they chose to remain subject to their existing Legacy Franchise Agreements.

107.    Plaintiffs and other Class Members had every right to rely on Defendants' misrepresentations inasmuch as Defendants included them in the documents they offered to Plaintiffs and other Class members as the basis upon which they should rely in making their decisions as to the appropriate choice for their individual situations.

108.    Defendants' fraud induced Option 1 franchisees into paying early termination penalties that were inherently and structurally unfair.  Had Option 1 franchisees known of the falsity of these representations, they would not have elected as they did, they would not have signed the Releases, and they would not have entered into their New Agreements.

109.    Defendants' fraud induced Option 3 franchisees not to act, when they otherwise would have acted.  These franchisees have been and will continue to be damaged in at least an amount equal to the royalties they pay over $499.00 a month – the amount non-Legacy entrants into the system pay for the same services.

110.    Cardinal is obligated to compensate Plaintiffs and the members of the Class for this conduct and otherwise remediate the ill effects of MSI's and Medicap's misconduct by virtue of its Guarantee.

WHEREFORE, Plaintiffs, on behalf of the Class, pray for the following relief on Count I:

a.      That the Court certify the Class, with Plaintiffs appointed class

1191269                                                        28

representatives and the undersigned counsel appointed Class counsel;

b.      That the Court enter judgment against Defendants and in favor of Option 1 franchises rescinding the Releases they signed, rescinding the forgivable promissory notes they signed, and ordering Defendants to return to each the amount they paid as early termination penalties, together with interest;

c.      That the Court enter judgment against Defendants and in favor of Option 3 franchisees in an amount to be proven at trial that will fairly and justly compensate Plaintiffs and the members of the Class for the damages caused by Defendants' conduct;

d.      That the Court award Plaintiffs their costs, reasonable attorneys' fees, and prejudgment interest;

e.      That the Court award punitive damages in an amount sufficient to punish Defendants and to deter future fraudulent conduct; and

f.      That the Court grant such other and further relief as may be proper under the circumstances.

## COUNT II:  BREACH OF CONTRACT

111.    For this Paragraph 111, Plaintiffs plead, allege, and incorporate by reference Paragraphs 1 through 110 of the Complaint as if fully set forth herein.

112.    Each and every Legacy Franchise Agreement MSI and Medicap entered into with their franchisees imposed upon them a duty of good faith and fair dealing in the contracts' performance and enforcement such that MSI and Medicap were required to exercise their discretion reasonably and with proper motive, rather than arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

113.    When the Legacy franchisees entered into their Legacy Franchise Agreements, their investment was based on a belief that they would be part of a system that would thrive and grow over the years.  MSI and Medicap, however, have abandoned their unitary franchise systems and converted to a system consisting of a fragmented mess of Legacy franchisees and Option 1 franchisees who have franchise agreements with materially different terms under which the "franchisor" is not providing a true franchise system, but instead a license or purchasing agreement.

114.    MSI and Medicap, in the Legacy Franchise Agreements, promised to promote their trademarks and service marks, noting that they have gained and continued to gain public acceptance and goodwill.

115.    MSI's Legacy Franchise Agreements specifically stated that MSI would "not obligate you to invest additional capital at a time when such investment cannot, in our reasonable judgment, be amortized during the remaining term of this Agreement."   MSI's and Cardinal's judgment was unreasonable, however, because despite their recognition of the difficulties franchisees are facing in the current business environment and their further recognition that the current franchise fees are not competitive, in order to convert to the 2009 Offering, MSI and Cardinal required the franchisees to make onerous additional investments and incur significant additional indebtedness in order to pay for the right to convert to the New System.  At the same time, non-Legacy franchisees could become part of the New System without having to make such an investment.

116.    MSI's and Medicap's Legacy Franchise Agreements, franchise disclosure documents, marketing materials, website, and their course of dealing, course of performance, and/or oral and written statements in their course of managing the Legacy Systems imposed upon

MSI and Medicap numerous duties regarding the support and growth of the Brands and the Systems.

117.    MSI's and Medicap's duties of good faith and Brand and System support extended to the 2009 Offering.

118.    MSI and Medicap exercised this discretion in bad faith or otherwise materially breached their express and implied contractual obligations when they, among other things:

> a.    structured the 2009 Offering on the royalties due under the Legacy Franchise Agreements, despite the fact that MSI and Medicap knew that the royalties they charged under the Legacy Franchise Agreements were exorbitant and in some cases so high as to prohibit doing business entirely;
>
> b.    informed their franchisees that if they opted to elect Option 3 and stay under their existing agreements MSI and Medicap would transition to the New System anyway and discontinue services and programs they had a contractual obligation to provide, including, but not limited to: store accounting, national and local advertising services, local store public relations and development services, access to various merchandising systems, national meetings, vendor duplication, subsidies for broadband internet access, rebates for specialty drugs, and other guidance and system standard maintenance and direction; and
>
> c.    failed to honor their commitments, including but not limited to, their promises to franchisees that they would provide franchisees support in every discipline of the pharmacy business and provide the best available pharmacy products, resources, and services; to provide franchisees with all

the services they would need to operate their pharmacies; to constantly develop new medicines, health products, and specialized medical supplies and equipment; and to invest in retail pharmacies with cutting edge operational support programs and brand-building marketing tools.

119.    The terms of the 2009 Offering also gave MSI, Medicap, and Cardinal discretion over whether or not to implement the New System by accepting its franchisees' responses to the 2009 Offering.

120.    MSI, Medicap, and Cardinal exercised this discretion in bad faith or otherwise materially breached their express and implied contractual obligations when they, among other things:

a.    accepted franchisees' elections in the absence of an overwhelming election of Option 1;

b.    accepted franchisees' elections in the absence of  the "universal" election of Option 1 by franchisees with agreements containing MFN clauses;

c.    decided to let non-Legacy entrants to the New System without any barriers to entry, thus rendering Option 3 franchises unmarketable;

d.    extended the enrollment period beyond the original end date of April 10, 2009;

e.    elected to split their franchise system in two, despite their professions on the importance of a uniform franchise system with franchisees subject to one type of agreement; and

f.    terminated or otherwise discontinued various services and/or support to Option 3 franchises including, among other things, accounting services,

certain advertising and marketing services, internet services and programs, annual meetings, 90-day specialty drug rebates, and many Medicine Shoppe and Medicap private label branded products.

121.    As a result of Defendants' breaches of their express and implied contractual obligations, Plaintiffs and members of the Class have suffered damages in an amount to be determined at trial, which, in no event, shall be less than $5,000,001.00 in the aggregate.

122.    Cardinal is obligated to compensate Plaintiffs and the members of the Class for this conduct and otherwise remediate the ill effects of MSI's and Medicap's misconduct by virtue of its Guarantee.

WHEREFORE, Plaintiffs, on behalf of the Class, pray for the following relief on Count II:

    a.    That the Court certify the Class, with Plaintiffs appointed Class Representatives and the undersigned counsel appointed Class counsel;

    b.    That the Court enter judgment against Defendants and in favor of Plaintiffs and the Class in an amount to be proven at trial that will fairly and justly compensate Plaintiffs and the members of the Class for the damages caused by Defendants' conduct, or, alternatively, that the Court rescind, cancel, repudiate, or otherwise void all current contacts and/or promissory notes between every Member of the Class and MSI, Medicap, and Cardinal;

    c.    That the Court award Plaintiffs their costs, reasonable attorneys' fees, and prejudgment interest; and

    d.    That the Court grant such other and further relief as may be proper under

the circumstances.

### COUNT III:   DECLARATORY JUDGMENT

123.    For this Paragraph 123, Plaintiffs plead, allege, and incorporate by reference Paragraphs 1 through 122 of the Complaint as if fully set forth herein.

124.    Pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of the Class, seek a declaration determining a question of actual controversy between Plaintiffs and the Class on the one hand, and Defendants on the other hand.

125.    Plaintiffs, on behalf of the Class, contend that MSI, Medicap, and Cardinal fraudulently induced some franchisees to elect Option 1 and others to elect Option 3 by misrepresenting the following facts, among others:

    a.    they would only accept the franchisees' elections if an overwhelming number of franchisees chose Option 1;

    b.    franchisees had to make their decisions by April 10, 2009;

    c.    the 2009 Offering was non-negotiable;

    d.    Defendants would not implement the new system unless those franchisees with agreements containing an MFN clause "universally accepted" the new system – i.e., chose Option 1; and

    e.    that the 2009 Offering was to grow and promote the Medicine Shoppe and Medicap franchise systems.

126.    Plaintiffs, on behalf of the Class, further contend, that:

    a.    each and every Legacy Franchise Agreement MSI and Medicap entered with their franchisees imposed upon them a duty of good faith and fair dealing in the contracts' performance and enforcement;

b.      MSI's and Medicap's Legacy Franchise Agreements and their course of dealing, course of performance, and/or oral and written statements imposed upon MSI and Medicap numerous duties regarding the support of the Brand and the System.

127.    Plaintiffs, on behalf of the Class, also contend that MSI and Medicap exercised their discretion in bad faith or otherwise materially breached their express and implied contractual obligations when they, among other things:

a.      deprived the franchisees of their reasonable expectations and the core benefit of their franchise agreements, because part of the consideration that the franchisees paid to join the system was based on their belief, and the implication that, the system would be a growing brand;

b.      accepted franchisees' elections in the absence of an overwhelming election of Option 1;

c.      accepted franchisees' elections in the absence of  the "universal" election of Option 1 by franchisees with agreements containing MFN clauses;

d.      decided to let non-Legacy entrants to the New System without any barriers to entry, thus rendering Option 3 franchises unmarketable;

e.      extended the enrollment period beyond the original end date of April 10, 2009;

f.      elected to split the franchise systems in two, despite their professions on the importance of a uniform franchise system with franchisees subject to one type of agreement; and

g.      terminated or otherwise discontinued various services and/or support to

> Option 3 franchisees including, among other things, accounting services, certain advertising and marketing services, internet services and programs, annual meetings, and 90-day specialty drug rebates.

128.     Plaintiffs, on behalf of the Class, additionally claim that MSI's and Medicap's tortious conduct and their breaches of their express and implied contract obligations were so substantial that Plaintiffs and the Class members have a right to rescind, cancel, annul, repudiate, or otherwise avoid their existing agreements with MSI, Medicap, and/or Cardinal.

129.     MSI and Medicap have denied and will continue to deny that the 2009 Offering and their course of conduct entitle Plaintiffs and the members of the Class to any relief whatsoever, declaratory or otherwise.

130.     An actual, justiciable controversy exists between MSI, Medicap, and Cardinal on the one hand, and Plaintiffs and every member of the Class on the other hand.

131.     Plaintiffs and the members of the Class have no adequate remedy at law and will suffer irreparable harm if their rights and obligations are not declared by this Court.

WHEREFORE, Plaintiffs, on behalf of the Class, pray for the following relief on Count III:

> a.     That the Court certify the Class, with Plaintiffs appointed Class Representatives and the undersigned counsel appointed Class counsel;
>
> b.     That the Court enter a judgment declaring that in making the 2009 Offering, MSI and Medicap materially breached their duties of good faith and fair dealing and/or their express and implied contractual obligations and committed gross fraud against their franchisees;
>
> c.     That the Court enter a judgment declaring that, as a result of MSI's and

Medicap's material and substantial breaches of their express and implied contractual obligations and other tortious conduct, the contracts and/or promissory notes of all class members are cancelled, annulled, repudiated, or are otherwise unenforceable;

d.      That the Court award Plaintiffs and the Class such other and further relief as it deems just and appropriate under the circumstances.

Date:  March 9, 2010                                         Respectfully submitted,

Lupner, Neidenthal & Logan

/s/ Frederick M. Luper

Fredrick M., Luper, Esq.
fluper@lnlattorneys.com
50 W. Broad Street, Suite 1200
Columbus, OH 43215
(614) 221-7663
(866) 345-4948 (fax)
*Attorneys for the Plaintiffs*